United States Bankruptcy Court
Southern District of Texas

**ENTERED**
September 26, 2022
Nathan Ochsner, Clerk

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| IN RE: | § | |
| | § | **CASE NO: 20-31585** |
| **PEARL RESOURCES LLC** | § | |
| and | § | **CHAPTER 11** |
| **PEARL RESOURCES OPERATING CO.** | § | |
| **LLC,** | § | |
| | § | |
| Debtors. | § | |
| | § | |
| **PEARL RESOURCES LLC** | § | |
| and | § | |
| **PEARL RESOURCES OPERATING CO.** | § | |
| **LLC,** | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| VS. | § | **ADVERSARY NO. 20-3077** |
| | § | |
| **ALLIED OFS LLC** | § | |
| and | § | |
| **MAVERICK OIL TOOLS LLC** | § | |
| and | § | |
| **PILOT THOMAS LOGISTICS LLC** | § | |
| and | § | |
| **RICARDO HUITRON** | § | |
| and | § | |
| **ADELAIDA RAMOS HUITRON** | § | |
| and | § | |
| **RH TRUCKING LLC,** | § | |
| | § | |
| Defendants. | § | |

## MEMORANDUM OPINION

Plaintiffs Pearl Resources LLC and Pearl Resources Operating Co. LLC seek to determine

the validity, priority, and extent of a mineral property lien filed by Maverick Oil Tools LLC pursuant

to Chapter 56 of the Texas Property Code against Pearl Resources LLC and Pearl Resources Oper-

ating Co. LLC's mineral leases.  Additionally, Maverick Oil Tools LLC has filed counterclaims

against Pearl Resources LLC and Pearl Resources Operating Co. LLC for breach of contract, quantum meruit, and promissory estoppel. A trial commenced on May 18, 2022 and concluded on May 19, 2022. All post-trial briefing concluded on July 15, 2022.

After considering the pleadings on file, evidence in the record, credibility of the witnesses, arguments of counsel and applicable law, the Court finds that Maverick Oil Tools LLC's mineral property lien filed against Pearl Resources LLC and Pearl Resources Operating Co. LLC is invalid. Pearl Resources LLC and Pearl Resources Operating Co. LLC's Objection to Maverick Oil Tools LLC's Proof of Claim Number 6 in 20-31585 is sustained. Maverick Oil Tools LLC's Proof of Claim Number 6 in 20-31585 for $133,635.28 is disallowed in its entirety. Pearl Resources LLC and Pearl Resources Operating Co. LLC's Objection to Maverick Oil Tools LLC's Proof of Claim Number 3 in 20-31586 is sustained. Maverick Oil Tools LLC's Proof of Claim Number 3 in 20-31586 for $133,635.28 is disallowed in its entirety. Furthermore, Maverick Oil Tools LLC's counterclaims for breach of contract, quantum meruit, and promissory estoppel are denied.

## I.  FINDINGS OF FACT

### A.  Procedural History

1.  On April 10, 2020, Plaintiffs Pearl Resources LLC, ("*Pearl Resources*") and Pearl Resources Operating Co. LLC, ("*Pearl Operating*"), (collectively "*Debtors*, *Pearl or Plaintiffs*") filed the instant adversary proceeding.[1]

2.  On April 30, 2020, Maverick Oil Tools, LLC ("*Maverick*") filed Proof of Claim Number 6 in 20-31585 for $133,635.28 ("*Claim Number 6*").[2]

3.  On April 30, 2020, Maverick filed Proof of Claim Number 3 in 20-31586 for $133,635.28 ("*Claim Number 3*").[3]

4.  On May 12, 2020, Maverick filed its answer and raised affirmative defenses.[4]

---

[1] ECF No. 1.
[2] *See* 20-31585 Claims Register.
[3] *See* 20-31586 Claims Register.
[4] ECF No. 9.

5.  On May 20, 2020, in case number 20-31585, Pearl filed "Debtors' Objections to Proofs of Claim Filed by Maverick Oil Tools, LLC, and Notice of Hearing" ("*Objection to Claim Number 6*").[5]

6.  On May 20, 2020, in case number 20-31586, Pearl filed "Debtors' Objections to Proofs of Claim Filed by Maverick Oil Tools, LLC, and Notice of Hearing" ("*Objection to Claim Number 3*").[6]

7.  On June 15, 2020, the Court entered an order consolidating the contested matters with respect to the claim objection at Docket No. 117 to the claim (as amended) of Pilot Thomas Logistics LLC, the claim objection at Docket No. 116 to the claim of Maverick, and the claim objection at Docket No. 115 to the claim (as amended) of Allied OFS LLC with Adversary Proceeding No. 20-3077 for all purposes and shall be subject to a single scheduling order.[7]

8.  On June 19, 2020, the Court entered an order consolidating the contested matters with respect to the contested matters in case number. 20-31586 with respect to the claim objection at Docket No. 33 to the claim (as amended) of Pilot Thomas Logistics LLC, the claim objection at Docket No. 32 to the claim of Maverick, and the claim objection at Docket No. 31 to the claim (as amended) of Allied OFS LLC with Adversary Proceeding number 20-3077 for all purposes and shall be subject to a single scheduling order.[8]

9.  On August 26, 2020, the Court entered an order consolidating Adversary Proceeding No. 20-3077 and Adversary Proceeding No. 20-3193 into Adversary No. 20-3077.[9]

10. On September 9, 2020, Debtors filed their "Debtors' Amended Complaint To Determine The Validity, Priority, And Extent Of Liens Filed By Various Creditors Against The Debtors' Property" ("*Amended Complaint*").[10]

11. On September 23, 2020, Maverick filed its answer to the Amended Complaint, raised affirmative defenses and asserted counterclaims against Debtors ("*Maverick's Counterclaims*").[11]

12. On October 30, 2020, Debtors filed their answer to Maverick's Counterclaims.[12]

13. On May 14, 2021, Maverick filed its response to the motions for summary judgment.[13]

---

[5] 20-31585 at ECF No. 116.
[6] 20-31586 at ECF No. 32.
[7] ECF No. 15.
[8] ECF No. 17.
[9] ECF No. 26.
[10] ECF No. 34.
[11] ECF No. 40.
[12] ECF No. 42.
[13] ECF Nos. 54, 57.

14. On July 29, 2021, the Court entered its Memorandum Opinion and Order denying the motion for summary judgment.[14]

15. A two-day trial commenced on May 18, 2022 and concluded on May 19, 2022.[15]

16. At the conclusion of the trial, the Court ordered post-trial briefing.[16]

17. Pearl filed its post-trial brief on July 14, 2022.[17]

18. Maverick filed its post-trial brief on July 15, 2022.[18]

## B. Stipulation of facts[19]

19. Debtors are Texas limited liability companies.[20]

20. Maverick is a Texas limited liability company.[21]

21. Pearl Resources is the lessee of a mineral lease known as the Garnet State Lease in Pecos County, Texas (the "*Garnet State Lease*"). The legal property description for the Garnet State Lease is: Section 20, Block 8, H&GN RR Co Survey, Abstract 5206 and the South Half (S/2) of Section 22, Block 8, H&GN RR Co Survey, Abstract 5208, Pecos County, Texas.[22]

22. The mineral estate of the Garnet State Lease is owned by the State of Texas and is subject to the Relinquishment Act.[23]

23. Pearl Resources is the lessee and 93% working interest owner of the Garnet State Lease. Pearl Operating was the operator of the Garnet State #4 Well on the Garnet State Lease. Pearl Operating owns an undivided 1% working interest in the Garnet State Lease. The State of Texas owns a 6% working interest in the Garnet State Lease as the holder of unleased inter-ests.[24]

24. With respect to the Garnet State Lease, Pearl Resources receives 99% of the net proceeds and Pearl Operating 1% of the net proceeds, prior to payout of the carried working interests of the State of Texas.[25]

---

[14] ECF No. 75.

[15] ECF Nos. 106, 109.

[16] ECF No. 110.

[17] ECF No. 132.

[18] ECF No. 133.

[19] On January 18, 2022, the parties filed a joint list of stipulated facts.

[20] ECF No. 97 at 5, ¶ 1.

[21] *Id.* at 5, ¶ 2.

[22] *Id.* at 5, ¶ 4.

[23] *Id.* at 5, ¶ 5; *see generally* TEX. NAT. RES. CODE §§ 52.171-52.190.

[24] ECF No. 97 at 5, ¶ 6.

[25] *Id.* at 6, ¶ 7.

25. In years 2016 and 2017, Pearl Operating met the requirements under Texas law to drill and operate oil and gas wells by providing information to the Railroad Commission of Texas (the "*RRC*") required by Tex. Nat. Res. Code § 91.142, having on file with the RRC the approved organization report and financial security required by Tex. Nat. Res. Code §§ 91.103-91.1091 and 16 Tex. Admin. Code § 3.1, and meeting the other requirements of Texas law to drill and operate oil and gas wells. The RRC provided Pearl Operating the license to operate oil and gas wells on the Garnet State Lease.[26]

26. In 2016 and 2017, Pearl Resources had not satisfied the requirements under Texas law that would allow it to drill and operate oil and gas wells. Pearl Resources has never drilled or operated oil and gas wells in Texas.[27]

27. Pearl Resources contracted with Pearl Operating to operate and oversee drilling of the Garnet State #4 Well (the "*Well*"). The contract was an oral agreement between Pearl Resources and Pearl Operating.[28]

28. Pearl Resources and its equity owner, Dr. Myra Dria ("*Dr. Dria*"), provided the funds for Pearl Operating to undertake the project of drilling and operating the Well.[29]

29. Pursuant to the agreement between Pearl Resources and Pearl Operating, the money to fund drilling the Well came in part from proceeds of the sale of oil and gas from the Brandenburg #1 Well – a well that is also located on the adjacent Brandenburg Lease in Pecos County, Texas. In early 2013, the Brandenburg #1 Well was reworked by Pearl Operating as the operator for Pearl Resources.[30]

30. Pearl Operating owns 1% of the working interest and is also the operator of the Brandenburg Lease. Pearl Resources owns 95% of the working interest in the Brandenburg Lease and the remainder is unleased ownership. As an owner of the Brandenburg Lease, Pearl Resources is entitled to receive 99% of the net revenues from production before payout of the unleased share and until payout for the unleased share of Brandenburg Lease operating and drilling expenses. As an owner of the Brandenburg Lease, Pearl Operating is entitled to receive 1% of the net revenues from production.[31]

31. As the operator, Pearl Operating received the funds from the sale of oil and gas from the Brandenburg Lease and used those funds to make payments to the Brandenburg royalty owners and vendors for services.[32]

---

[26] *Id.* at 6, ¶ 8.
[27] *Id.* at 6, ¶ 9.
[28] *Id.* at 6, ¶ 10.
[29] *Id.* at 6, ¶ 11.
[30] *Id.* at 7, ¶ 12.
[31] *Id.* at 7, ¶ 13.
[32] *Id.* at 7, ¶ 14.

32. Net revenues due to Pearl Resources from production on the Brandenburg Lease were contributed to conduct drilling operations on the Garnet State Lease.[33]

33. Pursuant to their agreement, Pearl Resources authorized Pearl Operating to use Pearl Resources' share of the net proceeds from production on the Brandenburg Lease to drill the Garnet State #4 Well.[34]

34. On September 13, 2016, Pearl Operating entered into a Turnkey Drilling Contract (the "*Turnkey Contract*") with PDS Drilling, LLC ("*PDS*") to drill the Garnet State #4 Well.[35]

35. The Turnkey Contract was a binding agreement between PDS and Pearl Operating.[36]

36. The Turnkey Contract price was $928,987. To be entitled to full payment, PDS was required to furnish equipment, labor and perform services to reach the depth of 11,000 ft. subsurface (+/- 200 ft.) and deliver a Successful Well as defined in Exhibit A. PDS had to meet both conditions to be entitled to full payment.[37]

37. The Turnkey Contract price was to be paid in two installments. The initial upfront payment of 30% of the total sum was due and payable at the time the rig was rigged up or positioned at the well site ready to spud. The remaining 70% of the total sum required PDS to drill the Well to 11,000 ft. subsurface (+/- 200 ft.) and would be due and payable five business days after delivery of the "Successful Well" requirements listed in Exhibit A of the Turnkey Contract and receipt of the final invoice.[38]

38. Exhibit A to the Turnkey Contract included "Successful Well Definition" which listed "required items" that "must be delivered to Operator at total depth to earn full turnkey funds." The items included, among other things, a complete mud log, a directional survey of the entire wellbore, a complete set of open hole logs, surface casing to be set below the base of the Capitan Aquifer, and properly cemented production casing to be set within approximately 50 feet of total depth.[39]

39. On October 21, 2016, Pearl Operating wired $278,696.10 (the 30% initial upfront payment) to PDS's bank account.[40]

40. On or about October 21, 2016, PDS (through its drilling contractor Bison Energy Services f/k/a Bison Drilling and Field Services ("*Bison*") delivered a rig to the well site for the Garnet State #4 Well.[41]

---

[33] *Id.* at 7, ¶ 15.
[34] *Id.* at 8, ¶ 16.
[35] *Id.* at 8, ¶ 17.
[36] *Id.* at 8, ¶ 18.
[37] *Id.* at 8, ¶ 19.
[38] *Id.* at 8, ¶ 20.
[39] *Id.* at 8-9, ¶ 21.
[40] *Id.* at 9, ¶ 22.
[41] *Id.* at 9, ¶ 23.

41. On October 24, 2016, PDS spudded in the Garnet State #4 Well.[42]

42. By October 26, 2016, PDS had drilled to about 2600 feet when freshwater from the Capitan Reef Formation Aquifer began to blow out of the Well and then migrated through porous subsurface formations (gravel) to also cause uncontrolled flow out of an adjacent well that supplied water for drilling operations (the "*Wild Well Incident*").[43]

43. The water blowing out of the Well and the water supply well contained hydrogen sulfide gas ("*H2S*").[44]

44. On October 27, 2016, PDS engaged Wild Well Control, Inc. ("*WWC*") to perform well control services.[45]

45. On November 3, 2016, PDS released WWC from the wellsite after WWC failed to bring the Well under control.[46]

46. Maverick furnished equipment during the period beginning on November 19, 2016 and ending on December 27, 2017.[47]

47. The materials or goods furnished by Maverick consisted primarily of cement retainers.[48]

48. Maverick also invoiced for "Service Man" days and rental of equipment.[49]

49. Maverick issued Invoice Numbers 161227 and 161228 (the "*Maverick Invoices*") for the equipment, materials and services it supplied. The Maverick Invoices were addressed and sent to PDS.[50]

50. Maverick's attorney, J.D. Benton, sent a letter dated June 9, 2017 to Pearl Operating entitled "Notice of Lien Claim" ("*Maverick's Lien Notice*"). The Maverick's Lien Notice identified the Garnet State Lease as the real property subject to the claimed lien.[51] Maverick authorized Mr. Benton to sign and deliver the Maverick's Lien Notice.[52]

51. On June 20, 2017, Maverick caused a document titled "Claim of Lien Under Oil and Gas Lien Act" to be recorded in the official records of Pecos County, Texas (the "*Maverick Lien*

---

[42] *Id.* at 9, ¶ 24.
[43] *Id.* at 9, ¶ 25.
[44] *Id.* at 9, ¶ 26.
[45] *Id.* at 9, ¶ 27.
[46] *Id.* at 10, ¶ 28.
[47] *Id.* at 12, ¶ 49.
[48] *Id.* at 12, ¶ 50.
[49] *Id.* at 12, ¶ 51.
[50] *Id.* at 12, ¶ 52.
[51] *Id.* at 12, ¶ 53.
[52] *Id.* at 13, ¶ 55.

*Claim*"). The Maverick Lien Claim was for $107,203.67 plus interest, costs and attorney's fees pursuant to Chapter 56 of the Property Code and the Texas Constitution. The Maverick Lien Claim was sworn to by Jim Dane as a "Member of Maverick Oil Tools, LLC."[53]

52. Mr. Dane was authorized by Maverick to sign the Maverick Lien Claim.[54]

53. The Maverick Lien Claim identified Maverick as the Claimant and identified the Garnet State Lease as the property subject to the claimed lien.[55]

54. The Maverick Lien Claim stated that "Claimant, to aid in the exploration for oil and gas upon the property described below, under a continuous contract, provided certain equipment and services."[56]

55. The Maverick Lien Claim stated that PDS was the "person to whom the equipment was furnished and performed, which may also be the owner or the agent of the owner[.]"[57]

56. Maverick issued Invoice No. 161227 to PDS in the amount of $163,741.98 showing a "Delivery Date" of 12/22/2016 for materials and/or "Service Man days" for November 19, 20, 21, 22 and 23, 2016 and December 3, 4, 5, 7, 19, 20, 21, 22, 23, 24, 26 and 27, 2016.[58]

57. Maverick issued Invoice No. 161228 to PDS in the amount of $8,461.69 showing a "Delivery Date" of 12/28/2016 for materials and "Service Man days" for December 21, 2016.[59]

58. Maverick and Pearl Resources and Pearl Operating executed a Master Services Agreement ("*Pearl MSA*").[60]

59. The Well was plugged and abandoned per the RRC's directions on February 10, 2017.[61]

60. On March 6, 2017, Pearl Operating filed a Form W-3 with the RRC certifying that the Well had been cemented in and was plugged and abandoned.[62]

61. After the Well was plugged and abandoned, PDS never delivered, a "Successful Well" as defined in the Turnkey Contract.[63]

---

[53] *Id.* at 13, ¶ 56.
[54] *Id.* at 13, ¶ 57.
[55] *Id.* at 13, ¶ 58.
[56] *Id.* at 13, ¶ 59.
[57] *Id.* at 13, ¶ 60.
[58] *Id.* at 13, ¶ 62.
[59] *Id.* at 13, ¶ 63.
[60] *Id.* at 14, ¶ 64.
[61] *Id.* at 14, ¶ 65.
[62] *Id.* at 14, ¶ 66.
[63] *Id.* at 14, ¶ 67.

62. PDS defaulted on its obligations under the Turnkey Contract by allowing the Wild Well Incident at the Well to occur, by failing to deliver a Successful Well. PDS also failed to deliver the documentation of the wellbore required pursuant to the Turnkey Contract. PDS never invoiced Pearl Operating for the additional 70% of the contract price that would have been due if PDS had delivered a "Successful Well" and met its other contract obligations.[64]

63. An RRC-Licensed operator is required to notify the appropriate RRC district office of any leak, spill or break pursuant to 15 Tex. Admin. Code § 3.20(a). Any communications or correspondence between Pearl Operating or Pearl Resources and the RRC referring or relating to Maverick or Pilot Thomas were made in Pearl Operating's capacity as the licensed operator of the Well. [65]

64. During the period from October 26 through the plugging of the Well in February 2017, in which there were numerous attempts to regain control of the Well and subsequent cementing and well-plugging operations, Dr. Dria, as the manager of Pearl Operating, had regular communications with PDS and with managers from the RRC regarding the well recovery efforts, cementing and later well-plugging operations. The RRC was required to approve all actions concerning any well-control, cementing and well-plugging operations on the Well. Communications with the RRC regarding these operations involved Pearl Operating because it was the operator of record for the Well.[66]

## II. CREDIBILITY OF THE WITNESSES

It is the Court's duty to assess and weigh the credibility of witnesses.[67] At the trial, the Court heard testimony from two witnesses: (a) Dr. Dria and (b) Jim Dane. After observing the witness and listening to their testimony, the Court makes the following observations regarding the credibility of the witnesses, as set forth below.

### a. Dr. Dria

Dr. Dria is the sole owner of Pearl Resources LLC and the manager of Pearl Resources Operating Co. LLC.[68] Dr. Dria has an undergraduate degree in polymer engineering from Case Western Reserve University and a doctorate in petroleum engineering from the University of Texas.[69] The

---

[64] *Id.* at 14, ¶ 68.
[65] *Id.* at 14, ¶ 69.
[66] *Id.* at 15, ¶ 70.
[67] *O'Connor v. Burg (In re Burg)*, 641 B.R. 120 (Bankr. S.D. Tex. 2022); *In re Bigler LP*, 458 B.R. 345, 367 (Bankr. S.D. Tex. 2011) (citing *Port Arthur Towing Co. v. John W. Towing, Inc. (In re Complaint of Port Arthur Towing Co.)*, 42 F.3d 312, 318 (5th Cir. 1995)).
[68] ECF No. 128 at 30, ¶ 1-14.
[69] *Id.* at 28.

first company Dr. Dria founded and led as CEO, Opal Resources, was initially backed with $60 million from a Goldman Sachs affiliate and sold its core asset three years later to W&T Offshore for $400 million, having generated six times the original invested equity.[70]  At trial, Dr. Dria responded to questions clearly, completely, and directly.[71]  Thus, the Court finds that she is very credible witness and gives substantial weight to her testimony.

**b.  Jim Dane**

Mr. Jim Dane is the owner and president of Maverick Oil Tools LLC.[72]  At trial, Jim Dane responded to questions clearly, completely, and directly. Thus, the Court finds that he was a very credible witness and also gives substantial weight to his testimony.

### III.   JURISDICTION, VENUE, AND CONSTITUTIONAL AUTHORITY

This Court holds jurisdiction pursuant to 28 U.S.C. § 1334, which provides "the district courts shall have original and exclusive jurisdiction of all cases under Title 11 or arising in or related to cases under Title 11."[73]  An adversary proceeding falls within the Court's "related to" jurisdiction if the "outcome of that proceeding could conceivably have any effect on the estate being adminis-tered in bankruptcy."[74]  Section 157 allows a district court to "refer" all bankruptcy and related cases to the bankruptcy court, wherein the latter court will appropriately preside over the matter.[75]  This Court determines that Plaintiffs' claims are core pursuant to 28 U.S.C. § 157(b)(2)(A),(B), and (K) because this adversary proceeding involves primarily core matters as it concerns administration of

---

[70] ECF No. 34 at 5, ¶ 20.
[71] *See, e.g., In re Ali*, 2015 Bankr. LEXIS 2443, 2015 WL 4611343 at *4 (Bankr. W.D. Tex. July 23, 2015) (analyz-ing the clarity, completeness, and quality of witness responses in order to make credibility determinations).
[72] ECF No. 128 at 145, ¶ 15-24.
[73] 28 U.S.C. § 1334.
[74] *Tex. Gen. Land Office v. Pearl Res. LLC (in re Pearl Res. LLC)*, Nos. 20-31585, 20-3169, 2022 Bankr. LEXIS 2337, at *8 (Bankr. S.D. Tex. 2022); *In re Trevino*, 535 B.R. 110, 125 (Bankr. S.D. Tex. 2015) (quoting *Wood v. Wood (In re Wood)*, 825 F.2d 90, 93 (5th Cir. 1987).
[75] 28 U.S.C. § 157(a); *see also In re Order of Reference to Bankruptcy Judges*, Gen. Order 2012-6 (S.D. Tex. May 24, 2012).

the estate, allowance or disallowance of claims against the estate, and determinations of the validity, extent, or priority of liens.[76]

Furthermore, this Court may only hear a case in which venue is proper.[77] Pursuant to § 1409(a), "a proceeding arising under title 11 or arising in or related to a case under title 11 may be commenced in the district court in which such case is pending."[78] Debtors' main chapter 11 case is presently pending in this Court and therefore, venue of this adversary proceeding is proper.

This Court must evaluate whether it has the constitutional authority to enter an order in this case. In *Stern*, which involved a core proceeding brought by the debtor under 28 U.S.C § 157(b)(2)(C), the Supreme Court held that a bankruptcy court "lacked the constitutional authority to enter a final judgment on a state law counterclaim that is not resolved in the process of ruling on a creditor's proof of claim."[79] This Court has the constitutional authority to enter a final order here because this is a core proceeding and there is no *Stern* issue. Interpreted narrowly, *Stern* is limited to one specific core proceeding, § 157(b)(2)(C), stripping bankruptcy courts of constitutional authority to enter a final order where a state law counterclaim is not resolved in the process of ruling on a creditor's proof of claim.[80] Section 157(b)(2)(C) is not implicated in this proceeding, so this Court concludes that the narrow limitation imposed by *Stern* does not prohibit this Court from entering a final order here.[81]

Alternatively, even if *Stern* applies to all of the categories of core proceedings, this Court still concludes that *Stern* does not prohibit this Court from entering a final order in this dispute. In

---

[76] 28 U.S.C. § 157(b)(2); *see also In re Southmark Corp.*, 163 F.3d 925, 930 (5th Cir. 1999) ("[A] proceeding is core under section 157 if it invokes a substantive right provided by title 11 or if it is a proceeding that, by its nature, could arise only in the context of a bankruptcy case.").
[77] 28 U.S.C. § 1408.
[78] 28 U.S.C. § 1409(a).
[79] 564 U.S. at 503.
[80] ECF Nos. 12, 13, 14, and 41.
[81] *Id.*

*Stern*, the debtor filed a counterclaim based solely on state law, and the resolution of this counterclaim did not resolve the validity or invalidity, of the claim held by the defendant.  Here, Debtors' claims, despite requiring application of state law, arise from an express Code provision and an express Bankruptcy Rule: § 502(a) and Rule 3007.  Moreover, while Defendant's counterclaims do not involve express bankruptcy provisions, unlike *Stern*, application of state law to this provision will resolve the validity or invalidity of the claims that Defendant asserts against Pearls' chapter 11 estates.  This suit is therefore easily distinguishable from the dispute in *Stern*, and this Court is constitutionally authorized to enter a final order.  Additionally, both Debtors[82] and Defendant[83] have consented to entry of a final order or judgment by the Bankruptcy Court.  This express consent also provides the Court constitutional authority to enter a final judgment.[84]  This Court is therefore constitutionally authorized to enter a final order or judgment.

## IV.  ANALYSIS

### A.  Maverick's proofs of claim

Section 502 provides that "a claim or interest, proof of which is filed under § 501 of this title, is deemed allowed, unless a party in interest . . . objects."[85]  The legislative history of § 502 provides in relevant part, that "a proof of claim or interest is prima facie evidence of the claim or interest.  Thus, it is allowed under subsection (a) unless a party in interest objects."[86]  While § 502 addresses

---

[82] ECF No. 41 ("Pearl consents to entry of final orders or judgment by the Bankruptcy Court if it is determined that the Bankruptcy Court, absent consent of the parties, cannot enter final orders or judgment consistent with Article III of the United States Constitution.").

[83] ECF No. 14 ("Maverick consents to entry of final orders or judgment by the Bankruptcy Court and consents to the entry of final orders or judgment by the Bankruptcy Judge if it is determined that the Bankruptcy Judge, absent consent of the parties, cannot enter final orders or judgment consistent with Article III of the United States Constitution.").

[84] *See Wellness Int'l Network, Ltd. v. Sharif*, 575 U.S. 665, 135 S. Ct. 1932, 1944–47, 191 L.Ed.2d 911 (2015) and *In re Delta Produce, L.P.*, 845 F.3d 609, 617 (5th Cir. 2016).

[85] 11 U.S.C. § 502(a).

[86] House Rep. No. 95-595, 95th Cong., 1st Sess. 351 (1977); Senate Rep. No. 95-989, 95th Cong., 2d Sess. 62 (1978); *In re Northbelt, LLC*, 630 B.R. 228, 247 (Bankr. S.D. Tex. 2020).

the form and content of claims it does not, by itself, establish grounds for disallowance of a claim.[87]

Rather, Bankruptcy Rule 3001 allocates the burden of proof with respect to a proof of claim for

which an objecting party has raised an objection that would warrant disallowance under § 502.[88]

The court in *In re DePugh* described the interplay between § 502 and Bankruptcy Rule 3001 during

a proof of claim dispute.[89]  If, for example, a creditor files a proof of claim in full compliance with

Bankruptcy Rule 3001, that claim is deemed prima facie valid and, if the debtor objects to that claim,

he or she must produce evidence sufficient to rebut the presumption of validity and establish that the

claim should be disallowed pursuant to § 502(b).[90]  If, however, a creditor files a proof of claim that

fails to comply with Bankruptcy Rule 3001, the Debtor has no evidentiary burden to overcome when

lodging a claim objection pursuant to § 502(b), at which point the burden shifts back to the claimant

to prove the underlying validity of its claim by a preponderance of the evidence in order to have its

claim allowed.[91]

Bankruptcy Rule 3001 requires that a proof of claim: (1) be in writing; (2) make demand on

the debtor's estate; (3) express the intent to hold the debtor liable for the debt; (4) be properly filed;

and (5) be based upon facts which would allow, as a matter of equity, to have the document accepted

as a proof of claim.[92]  On April 20, 2020, Maverick filed Proof of Claim Number 6 in 20-31585[93]

and Proof of Claim Number 3 in 20-31586.[94]  Each of these claims were in writing and made de-

mands upon the debtor's estate.  Specifically, Proof of Claim Number 6 was a secured claim for

---

[87] *In re Tran*, 369 B.R. 312, 320 (S.D. Tex. 2007) ("In other words, courts must generally allow a properly filed claim, but if one of the nine statutory provisions governs, then the court may summarily disallow the claim.").

[88] FED. R. BANKR. P. 3001.

[89] *In re DePugh*, 409 B.R. 84, 97-98 (Bankr. S.D. Tex. 2009).

[90] *Id.*

[91] *Id.*; *see* 11 U.S.C. § 502; *In re O'Connor*, 153 F.3d 258, 260-61 (5th Cir. 1998); *In re Fid. Holding Co.*, 837 F.2d 696, 698 (5th Cir. 1988).

[92] *In re Armstrong*, 320 B.R. 97, 103-04 (Bankr. N.D. Tex. 2005).

[93] *See* 20-31585 Claims Register.

[94] *See* 20-31586 Claims Register.

$133,635.28 including $107,203.67 for the total amount outstanding on Invoices sent to Pearl, $9,793.01 in attorney's fees, and $16,638.60 in interest accrued through the petition date.[95]  Proof of Claim Number 3 was also a secured claim for $133,635.28 including $107,203.67 for the total amount outstanding on Invoices sent to Pearl, $9,793.01 in attorney's fees, and $16,638.60 in interest accrued through the petition date.[96]

These claims each expressed an intent to hold Pearl liable for the debt by listing Pearl as the debtor against whom they wish to recover.[97]  Furthermore, both Proof of Claim Number 6 and Proof of Claim Number 3 were properly filed using Official Form 410 and contained a copy of the relevant contract, as required by Bankruptcy Rule 3001(c)(1) since the claims were based on a writing.[98] Finally, the facts upon which these proofs of claim are based is that a lien was placed upon Debtor's mineral leases as a result of Debtor's alleged failure to pay Defendant for work done pursuant to a direct contract.

Accordingly, Proofs of Claim Number 6 and 3, having been filed in full compliance with Bankruptcy Rule 3001, are deemed prima facie valid.

On May 20, 2020, Pearl filed an Objection to Claims Numbers 6[99] and 3[100]  contesting the prima facie validity of each of the Claims.[101]  As such, Pearl must produce evidence sufficient to rebut the presumption of validity and establish that each Claim should be disallowed pursuant to § 502(b).[102]  If Pearl fails to do so, the Claims will be allowed.[103]

**B.  The validity, priority, or extent of Maverick's Lien Claim**

---

[95] 20-31585 Claims Register.
[96] 20-31586 Claims Register.
[97] *Id.*
[98] *Id.*; FED. R. BANKR. P. 3001(c)(1).
[99] 20-31585 at ECF No. 116.
[100] 20-31586 at ECF No. 32.
[101] *In re DePugh*, 409 B.R. at 97-98.
[102] *Id.*
[103] *Id.*

On June 20, 2017, Maverick caused its Lien Claim to be recorded in the official records of Pecos County, Texas.[104]  An adversary proceeding is required to "determine the validity, priority, or extent of a lien or other interest in property."[105]  The Code provides a specified order demonstrating which expenses and claims have priority over others in a confirmed plan.[106]  The Code does not define "validity" or "extent," however, this Court may consider the ordinary meaning of each in determining whether an adversary proceeding is required pursuant to Bankruptcy Rule 7001(2).[107]  The requirement to determine the extent of a lien in an adversary proceeding derives from "procedural rules adopted by the Court for the orderly transaction of its business that are not jurisdictional."[108]  Valuation, however, is "not [an issue of] validity in any guise" and therefore, does not require an adversary proceeding.[109]  "Although 'validity, priority, or extent' are expressed in the disjunctive, often more than one of these aspects of a lien will be determined in the same proceeding."[110]

The validity of Maverick's Lien Claim under Chapter 56 of the Texas Property Code is at the heart of this proceeding.  Section 56.002 of the Texas Property Code generally grants "[a] mineral contractor or subcontractor . . . a lien to secure payment for labor or services" related to their "mineral activities."[111]  In turn, "mineral activities" is broadly defined to include "digging, drilling, torpedoing, operating, completing, maintaining, or repairing an oil, gas, or water well, an oil or gas pipeline,

---

[104] ECF No. 97 at 13, ¶ 56.
[105] FED. R. BANKR. P. 7001(2); *In re Shank*, 569 B.R. 238, 252 (Bankr. S.D. Tex. 2017).
[106] 11 U.S.C. § 507.
[107] BLACK'S LAW DICTIONARY (10th ed. 2014) (defining as "legally sufficient; binding"); 7 COLLIER ON BANKRUPTCY, ¶ 7001.03 (16th ed. 2017) (noting that "[t]he term 'extent of a lien' may be misleading" and that an adversary proceeding is required to determine the extent to which a lien attaches to specific property claimed).
[108] *Espinosa*, 559 U.S. at 272 (quoting *Kontrick v. Ryan*, 540 U.S. 443, 454, 124 S. Ct. 906, 157 L. Ed. 2d 867 (2004)).
[109] 7 COLLIER ON BANKRUPTCY, ¶ 7001.03 (16th ed. 2017).
[110] *Id.*
[111] TEX. PROP. CODE ANN. § 56.002.

or a mine or quarry."[112]  A "mineral contractor" is defined as a person "who performs labor or fur-

nishes or hauls material, machinery, or supplies used in mineral activities under an express or implied

contract with a mineral property owner . . . ."[113]  And a "mineral subcontractor"  is defined as a

person who "furnishes or hauls material, machinery, or supplies used in mineral activities under

contract with a mineral contractor or with a subcontractor; performs labor used in mineral activities

under contract with a mineral contractor; or performs labor used in mineral activities as an artisan or

day laborer employed by a subcontractor."[114]

Pearl contends that Maverick's Lien Claim for $107,203.67 is not valid under Chapter 56 of

the Texas Property Code.[115]  As stated above, $107,203.67 is the portion of Maverick's Proof of

Claim Numbers 6 and 3 representing the outstanding liability on the Invoices sent to Pearl.  Since

the Court has already determined that Proofs of Claim Numbers 6 and 3 are prima facie valid, Pearl

must produce evidence sufficient to rebut the presumption of validity and establish that the Claims

should be disallowed pursuant to § 502(b).[116]  If Pearl fails to do so, the Claims will be allowed.[117]

However, if Pearl produces sufficient evidence to rebut the presumption, the burden shifts to Mav-

erick to prove the validity of Maverick's Lien Claim by a preponderance of the evidence.[118]

Pearl offers three main arguments as to why Maverick's Lien Claim is not valid, to wit: (1)

because it is barred by the limitation of liability afforded to Pearl as mineral property owners under

Tex. Prop. Code § 56.043; (2) because Maverick's Lien Claim fails to comply with Tex. Prop. Code

§ 56.022; and (3) because Maverick's Lien Claim fails to comply with Tex. Prop. Code § 56.021(b).

---

[112] *Id.* § 56.001(1).
[113] *Id.* § 56.001(2).
[114] *Id.* § 56.001(4)(A)-(C).
[115] ECF No. 34 at 17, ¶ 57.
[116] *In re Northbelt, LLC*, 630 B.R. at 244.
[117] *Id.*
[118] *Id.* ("If the objecting party successfully presents enough evidence to meet that burden, the burden then shifts and the claimant must, by a preponderance of evidence, prove the validity of the claim.").

Nevertheless, and as discussed more fully below, since the Court finds that Maverick's Lien Claim is barred by Tex. Prop. Code § 56.043, the Court need not discuss Pearl's alternative arguments under Tex. Prop. Code §§ 56.022 and § 56.021(b).

### 1. Maverick's Lien Claim is barred by Tex. Prop. Code § 56.043

### a. The Turnkey Drilling Contract between Pearl and PDS

On September 13, 2016, Pearl Operating entered into a Turnkey Drilling Contract with PDS to drill the Garnet State #4 Well,[119] and on June 20, 2017, Maverick caused its Lien Claim to be recorded in the official records of Pecos County, Texas.[120] Pearl asserts that Maverick's Lien Claim is barred by the limitation of liability afforded to Pearl as mineral property owners under Tex. Prop. Code § 56.043.[121] Tex. Prop. Code § 56.043 provides that:

> A property owner who is served with a mineral subcontractor's notice may withhold payment to the contractor in the amount claimed until the debt on which the lien is based is settled or determined to be not owed. The owner is not liable to the subcontractor for more than the amount that the owner owes the original contractor when the notice is received.

Stated simply, the owner is liable to a subcontractor only to the extent that he is liable to his contractor.[122] Thus, the right to the enforcement of the lien depends upon the state of the account between the owner and his contractor, and not upon the condition of the account between the contractor and his subcontractor, when the owner receives notice of the claim.[123] It follows, as a necessary corollary, that if the owner has paid his contractor in full before notice of the subcontractor's claim is received, then the owner is not liable, and his property is not subject to the lien afforded by Chapter 56, for payment of the subcontractor's claim.[124]

---

[119] *Id.* at 8, ¶ 17.
[120] ECF No. 97 at 13, ¶ 56.
[121] ECF No. 97 at 2.
[122] *Energy-Agri Prods., Inc. v. Eisenman Chem. Co.*, 717 S.W.2d 651, 653 (Tex. App.—Dallas 1986, no writ).
[123] *Id.*
[124] *Id.*

The basis of Pearl's Tex. Prop. Code § 56.043 argument is that it is the property owner of the Garnet State Lease and that that it entered into a contract with original contractor PDS to drill the Well and not with Maverick.[125]   Subsequently, PDS hired Maverick as a subcontractor.[126]   In essence, Pearl contests that PDS, not Maverick, was the original contractor and that Maverick was merely a subcontractor to PDS.   Pearl further argues that it does not owe PDS any outstanding liability due to its failure to deliver a "Successful Well."[127]   Thus, Pearl contends that, pursuant to Tex. Prop. Code § 56.043, subcontractor Maverick cannot recover from Pearl since Pearl is not liable to original contractor PDS for any outstanding debt.[128]   To support its contention, at trial , Pearl submitted  into evidence a copy of the Garnet State Lease along with the testimony of Dr. Dria verifying that Pearl was in fact the property owner,[129] and a copy of the Turnkey Drilling Contract.[130]   The Turnkey Drilling Contract  established that on September 13, 2016, Pearl entered into an agreement with PDS for drilling at the Well[131] and that Maverick was not a party to the Turnkey Drilling Contract.[132]

Under the Turnkey Drilling Contract, Pearl agreed to pay PDS 30% of the total sum due to PDS upfront with the remaining 70% to be paid no later than five business days after receipt of the final invoice and after the delivery of all elements of the "Successful Well" as defined in Exhibit A of the Turnkey Drilling Contract.[133]   Recall that the parties stipulated that PDS defaulted under the Turnkey Drilling Contract and failed to provide a "Successful Well,"[134]  and that PDS never invoiced

---

[125] ECF No. 132 at 15, ¶ 6.
[126] *Id.*
[127] *Id.*
[128] *Id.*
[129] ECF No. 95-4.
[130] ECF No. 102-1 at 1-8.
[131] *Id.*
[132] *Id.* at 1.
[133] *Id.* at 2.
[134] ECF No. 97 at 14, ¶ 68.

Pearl Operating for the additional 70% of the contract price that would have been due if PDS had delivered a "Successful Well" and met its other contractual obligations.[135]  Along with the Turnkey Drilling Contract, these stipulations demonstrate that Pearl had no outstanding liability to PDS due to PDS's failure to produce a "Successful Well."

### b.   The PDS-Maverick master service agreement (PDS MSA)

On December 16, 2016, PDS executed a master service agreement between itself and Maverick.[136]  Under Texas law, "[a] master service agreement does not provide for the performance of any specific work or any specific price; instead it requires the issuance of work orders and, upon acceptance of the work orders, they become part of the master service agreement."[137]  As the Fifth Circuit has noted, a master service agreement is a not contract by itself but "merely sets out the rules of the game in the event the parties decide to play ball."[138]

At trial, Pearl  demonstrated that execution of the PDS MSA between PDS and Maverick was accomplished when Maverick representative Jim Dane emailed Invoice Numbers 161227 and 161228 to PDS at info@pdsdrilling.com in December 2016 or January 2017.[139]  Notably, Invoice No. 161227 was acknowledged and signed on December 27, 2016 by Godswill Nwankwo, a representative of PDS.[140]  Additionally, on January 25, 2017, PDS issued partial payment of $65,000 to Maverick for work conducted on the Well.[141]  Finally, Maverick provided a Form W-9 to PDS at the request of PDS office manager Etop Esen on December 16, 2016.[142]  Taken together, this evidence clearly establishes Pearl's contention that Maverick entered into a subcontract with PDS for work

---

[135] *Id.*
[136] ECF No. 102-18.
[137] *Shell W. E&P, Inc. v. Pel-State Bulk Plant, LLC*, 509 S.W.3d 581, 587 (Tex. App.—San Antonio 2016, no pet.).
[138] *Matte v. Zapata Offshore Co.*, 784 F.2d 628, 630 (5th Cir. 1986).
[139] ECF No. 102-21 at 17.
[140] ECF No. 102-16 at 19.
[141] *Id.*
[142] ECF Nos. 102-18 and 102-21 at 1-3.

on the Well.   In sum, Pearl has offered sufficient evidence to show the applicability of Tex. Prop. Code § 56.043 by proving that Pearl was the property owner,[143] that PDS was the original contractor to Pearl,[144] that PDS entered into a subcontract agreement with Maverick for work on the Well,[145] and that Pearl owes no outstanding liability to PDS.[146]

Accordingly, Pearl has successfully rebutted the prima facie validity of Maverick's Lien Claim as asserted in Maverick's Proofs of Claim. [147]   The burden now shifts to Maverick to prove the validity of Maverick's Lien Claim contained within Maverick's Proofs of Claim by a preponderance of the evidence.[148]

   **c.   The Pearl MSA**

On December 5, 2016, Maverick and Pearl also entered into a master service agreement, (the "*Pearl MSA*").[149]   Pursuant to the Pearl MSA, Maverick contends that the work Maverick provided on the Well was pursuant to the Pearl MSA,[150] and therefore asserts that its Lien is valid and Tex. Prop. Code § 56.043 does not apply because Maverick was an original contractor of Pearl and not a subcontractor to PDS, as alleged by Pearl.[151]   Since Tex. Prop. Code § 56.043 only limits recovery of a subcontractor, this section would not apply if the work done by Maverick on the Well was actually done as an original contractor.

---

[143] ECF No. 97 at 15, ¶ 3.

[144] ECF No. 102-1 at 1-8.

[145] ECF No. 102-18.

[146] ECF No. 97 at 14, ¶ 68.

[147] As a party objecting to a proof of claim, Pearl "must produce evidence sufficient to rebut the presumption of validity and establish that the claim should be disallowed pursuant to § 502(b)." *In re Northbelt, LLC*, 630 B.R. 228, 248 (Bankr. S.D. Tex. 2020); *In re DePugh*, 409 B.R. 84, 97-98 (Bankr. S.D. Tex. 2009).

[148] *In re Northbelt, LLC*, 630 B.R. at 244 ("If the objecting party successfully presents enough evidence to meet that burden, the burden then shifts and the claimant must, by a preponderance of evidence, prove the validity of the claim.").

[149] ECF No. 94-5.

[150] ECF No. 133 at 7, ¶ 32.

[151] *Id.*

As stated above, under Texas law, a master service agreement standing alone is not a contract since it does not provide for the performance of any specific work or any specific price; instead it requires the issuance of work orders and, upon acceptance of the work orders, they become part of the master service agreement.[152]  Maverick offers two theories as to how Pearl demonstrated the required additional assent to ratify the Pearl MSA, to wit: (i) that Dr. Dria personally approved the work Maverick conducted on the Well in December 6, 2016 email; and (ii) that the inclusion of Section 9.4 in the Pearl MSA shows Pearl's intent to be bound on the work Maverick conducted on the Well.  The Court will discuss each in turn.

### (i)   whether Dr. Dria's December 6, 2016 email bound Pearl to the work Maverick conducted on the Well

Maverick asserts that the necessary additional acceptance from Pearl for work conducted on the Well occurred in an e-mail dated Tuesday, December 6, 2016.[153]  In this email, Maverick contends that "Dr. Dria approved and directed the dissemination of a cement remediation plan to the contractors on the well site, …which she knew Maverick was on the well site to perform."[154]  However, as part of this email chain, PDS representative, Nwankwo and not Maverick, is the party that reached out to Dr. Dria.[155]  Nwankwo's email included ten proposed steps to take on the Well.[156]  Of those, only three related to work to be performed by Maverick.[157]  Dr. Dria responds to Nwankwo approving nine of the ten steps and Nwankwo in turn tells Maverick that it may proceed.[158]  Although Maverick argues that the December 6, 2016 email satisfies the requirement for additional assent, Maverick fails to offer any legal authority to support this assertion.  Furthermore, Dr. Dria does not

---

[152] *Shell W. E&P, Inc*, 509 S.W.3d at 587.
[153] ECF No. 133 at 5.
[154] *Id.*
[155] ECF No. 94-8.
[156] *Id.*
[157] *Id.*
[158] *Id.*

even communicate directly with Maverick but simply to Nwankwo of PDS.[159]  Instead, the December 6, 2016 email from Dr. Dria fails to demonstrate sufficient mutual assent to make the work conducted at the Well covered under the Pearl MSA because Jim Dane conceded that further authorization was required under the Pearl MSA,[160] and admitted that that there were no written work orders between Maverick and either of the Pearl entities[161]  which included the email chain where no work order is attached or price quotes provided.[162]

Accordingly, the Court finds that Maverick has failed to demonstrate by a preponderance of the evidence that the December 6, 2016 email constitutes sufficient mutual assent under the Pearl MSA to bind Pearl for the work Maverick conducted at the Well.

### ii. whether Section 9.4 of the Pearl MSA bound Pearl for the work Maverick conducted on the Well

Next, Maverick argues that the inclusion of Section 9.4 in the Pearl MSA shows Pearl's intent to be bound on the work Maverick conducted on the Well.  Section 9.4 of the Pearl MSA provides for the specific circumstances involving a wild well incident.  There it states in a section entitled "Liability for Wild Well," that "Company shall be liable for the costs of regaining control of any wild well, as well as for cost of removal of any debris, and shall release Contractor from, and Contractor shall indemnify against any liability for such cost."[163]  This is noteworthy because the Well experienced a wild well incident on October 26, 2016[164] and Maverick began working shortly thereafter on November 19, 2016 for work associated with this incident.[165]  Maverick asserts that the inclusion of this provision is evidence that the work contemplated in the Pearl MSA was that which

---

[159] *Id.*
[160] ECF No. 128 at 179.
[161] *Id.* at 179-80.
[162] ECF No. 94-8.
[163] ECF No. 94-5.
[164] ECF No. 97 at 9, ¶ 25.
[165] ECF No. 94-4 at 2.

Maverick performed in November and December of 2016.[166]  Maverick owner and president Jim Dane even testified that he would not have conducted work on the Well without the inclusion of Section 9.4.[167]

Nevertheless, at trial, Jim Dane contradicted this statement by also testifying that Maverick worked on the Well for nearly two weeks before the Pearl MSA was signed.[168]  Furthermore, irrespective of the text of Section 9.4 Maverick still failed to offer sufficient evidence that Maverick issued work orders to Pearl or that Pearl received and approved any work orders related to the Pearl MSA.  The only evidence before the Court is Jim Dane's testimony stating that "I think my secretary did send some invoices" but that he could not be sure whether the address was correct or even whether the invoices were actually sent.[169]  No additional proof that these invoices did get mailed was offered into evidence and Dr. Dria testified that she never received any invoices from Maverick prior to the filing of the bankruptcy.[170]

Accordingly, the Court finds that Maverick has failed to demonstrate by a preponderance of the evidence that the inclusion of Section 9.4 in the Pearl MSA constitutes sufficient mutual assent under the Pearl MSA to bind Pearl for the work Maverick conducted at the Well.  Since both of Maverick's arguments failed to show mutual assent to the Pearl MSA, the Court further finds that Maverick failed to meet its burden to prove the validity of its Lien by a preponderance of the evidence.[171]  Maverick's Lien Claim pursuant to its Proofs of Claim are invalid pursuant to Tex. Prop. Code § 56.043.

---

[166] ECF No. 133 at 7, ¶ 32.
[167] ECF No. 132 at 9, ¶ 69.
[168] ECF No. 129 at 43.
[169] ECF No. 128 at 162.
[170] *Id.* at 79.
[171] *In re Northbelt, LLC*, 630 B.R. at 244 ("If the objecting party successfully presents enough evidence to meet that burden, the burden then shifts and the claimant must, by a preponderance of evidence, prove the validity of the claim.").

**C. Maverick's Proofs of Claims are not allowed**

As detailed above, Maverick filed Proof of Claim Number 6 as a secured claim for $133,635.28 including $107,203.67 for the total amount outstanding on Invoices sent to Pearl, $9,793.01 in attorney's fees, and $16,638.60 in interest accrued through the petition date.[172] Maverick also filed Proof of Claim Number 3 as a secured claim for $133,635.28 including $107,203.67 for the total amount outstanding on Invoices sent to Pearl, $9,793.01 in attorney's fees, and $16,638.60 in interest accrued through the petition date.[173]

In the analysis above, the Court determined that both Proofs of Claim were prima facie valid. However, in Pearl's Objections to Maverick's Proofs of Claim 6 and 3, Pearl produced evidence sufficient to rebut the presumption of the validity of Maverick's Lien Claim and established that the Claims should be disallowed pursuant to § 502(b). Specifically, the Court found that Tex. Prop. Code § 56.043 bars recovery of $107,203.67 for the total amount outstanding on Invoices sent to Pearl and thus Maverick's Liens asserted in both Claims 6 and 3. Furthermore, since the Court found Maverick's Lien Claim asserted in both Claims 6 and 3 to be invalid, it necessarily follows that the $9,793.01 in attorney's fees, and $16,638.60 in interest accrued through the petition date are also invalid. With the burden shifted back to Maverick, Maverick was unable to prove the validity of its Lien Claims to Proofs of Claim 6 and 3 by a preponderance of the evidence.

As a result of failing to prove the validity of its Lien Claims by a preponderance of the evidence, Proofs of Claim 6 and 3 will each be disallowed in their entirety. Pearl demonstrated the applicability of Tex. Prop. Code § 56.043 barring recovery from Pearl for the work Maverick provided on the Well. Furthermore, Maverick was unable to show the existence of a valid contract between Pearl and Maverick. Since Maverick failed to demonstrate by a preponderance of the

---

[172] 20-31585 Claims Register.
[173] 20-31586 Claims Register.

evidence that the Pearl MSA was executed by Maverick and Pearl, Pearl was not obligated to Maverick at all.  Thus, not only are Maverick's Liens invalid but Maverick is barred from recovery from Pearl in its entirety.

Accordingly, Pearl's Objection to Proof of Claim Number 6 is sustained and Maverick's Proof Claim Number 6 in 20-31585 in the amount of $133,635.28 is disallowed in its entirety.  Furthermore, Pearl's Objection to Proof of Claim Number 3 is sustained and Maverick's Proof Claim Number 3 in 20-31586 in the amount of $133,635.28 is disallowed in its entirety.

## D.  Maverick's Counterclaim for breach of contract

Under Texas law, the elements of a breach of contract claim are: (1) the existence of a valid contract; (2) performance or tendered performance by the plaintiff; (3) breach of the contract by the defendant; and (4) damages sustained by the plaintiff because of the breach.[174]  Maverick contends that the Pearl MSA was a valid contract with Pearl;[175] that Maverick performed by furnishing equipment, materials, and labor to the Well;[176] that Pearl has breached the Pearl MSA by failing to pay Maverick;[177] and that this has resulted in a $107,203.67 debt that Pearl owes to Maverick.[178]

Here, Maverick cannot establish the existence of a valid contract because it has failed to demonstrate the existence of a valid contract between Maverick and Pearl.  Although the parties entered into the Pearl MSA, a master service agreement alone is not a binding contract.[179]  Additionally, and as stated supra, Maverick failed to offer persuasive evidence of the required additional consent.  While Maverick maintains that the December 6, 2016 email of Dr. Dria is sufficient to show assent to the work Maverick conducted on the Well,[180] this Court disagrees.  As the Court

---

[174] *Bridgmon v. Array Sys. Corp.*, 325 F.3d 572, 577 (5th Cir. 2003).
[175] ECF No. 133 at 13.
[176] *Id.* at 14.
[177] *Id.*
[178] *Id.*
[179] *Shell W. E&P, Inc.*, 509 S.W.3d at 587.
[180] ECF No. 133 at 12-13.

detailed above, the communication between Dr. Dria on behalf of Pearl with PDS representative Nwankwo is too attenuated to show assent between Pearl and Maverick. Furthermore, Maverick's subsequent actions of sending invoices directly to PDS and not Pearl,[181] receiving a $65,000 payment from PDS,[182] and sending a W-9 to PDS only,[183] also undermine Maverick's argument that a valid a contract existed between Pearl and Maverick. Thus, Maverick has failed to demonstrate the first element of its breach of contract counterclaim.

Next, Maverick has also failed to demonstrate performance or tendered performance by the plaintiff.[184] Even though Maverick admitted evidenced demonstrating that it provided equipment, materials, and labor, it cannot show that it did so pursuant to the Pearl MSA. Similarly, Maverick cannot show breach of the contract by the defendant because Pearl cannot breach a contract in which it was not contractually obligated to perform. Finally, Maverick has not shown damages sustained by the plaintiff because of the breach because Maverick failed to demonstrate Pearl's liability for the work done on the Well under the Pearl MSA.

Accordingly, Maverick's Counterclaim for breach of contract is denied.

**E. Maverick's Counterclaim for quantum meruit**

Quantum meruit is an equitable remedy that exists independent of a contract.[185] To recover under quantum meruit a claimant must prove that: (1) valuable services were rendered or materials furnished; (2) for the person sought to be charged; (3) which services and materials were accepted by the person sought to be charged, used and enjoyed by him; and (4) under such circumstances as reasonably notified the person sought to be charged that the plaintiff in performing such services was

---

[181] ECF No. 102-16 at 19.
[182] *Id.*
[183] ECF Nos. 102-18 and 102-21 at 1-3.
[184] *Bridgmon*, 325 F.3d at 577.
[185] *Vortt Exploration Co. v. Chevron U.S.A., Inc.,* 787 S.W.2d 942, 944 (Tex.1990).

expecting to be paid by the person sought to be charged.[186]  Quantum meruit is generally only available when there is no contract governing the services rendered.[187]  However, the Texas Supreme Court has recognized three exceptions to the general rule that an express contract bars recovery on a quantum meruit theory: (1) where a plaintiff has partially performed an express contract but was prevented from completing the contract because of the defendant's breach; (2) where a plaintiff partially performs a unilateral contract; and (3) where a breaching plaintiff in a construction contract partially performed under the contract and the defendant accepts and retains benefits arising as a direct result of the plaintiff's partial performance.[188]

Maverick's quantum meruit claim fails since there was a contract governing the services Maverick provided between Maverick and PDS, and no exceptions apply.[189]  First, a valid contact for the services Maverick provided at the Well existed between Maverick and PDS.  Specifically, the PDS MSA was signed on December 16, 2016[190] and later ratified by the parties.  Evidence supporting the subsequent approval of the PDS MSA include copies of multiple invoices that Jim Dane emailed to PDS in December 2016 or January 2017.[191]  Of these invoices, Invoice No. 161227 was acknowledged and signed on December 27, 2016 by PDS representative Nwankwo.[192]  On January 25, 2017, PDS issued partial payment of $65,000 to Maverick for work conducted on the Well.[193]  Additionally, Maverick provided a Form W-9 to PDS at the request of PDS office manager Etop

---

[186] *Id.*
[187] *Id.*
[188] *Viking Prospector, Inc. v. Xtreme Indus., L.L.C. (In re Viking Offshore (USA) Inc.)*, Nos. 08-31219-H3-11, 08-3296, 2009 Bankr. LEXIS 2467, at *21 (Bankr. S.D. Tex. 2009).
[189] ECF No. 132 at 16.
[190] ECF No. 102-18.
[191] ECF No. 102-21 at 17.
[192] ECF No. 102-16 at 19.
[193] *Id.*

Esen on December 16, 2016.[194]  This evidence clearly demonstrates the existence of a contract between Maverick and PDS, for the services performed by Maverick at the Well.

Next, none of the three quantum meruit exceptions apply here.  Each of the exceptions enumerated by the Texas Supreme Court requires partial performance of the contract by the plaintiff.[195]  At no point during trial did Maverick ever argue that it partially performed under the PDS MSA.

Accordingly, the Court finds that since a valid contract existed between Maverick and PDS for the work Maverick conducted at the Well and none of the exceptions apply, Maverick's claim for quantum meruit is denied on this basis alone.

However, even if the claim for quantum meruit had merit,  Maverick's claim for quantum meruit fails to plead a necessary element and that is that Maverick "reasonably notified [Pearl], the person sought to be charged, that [Maverick], in performing such services, was expecting to be paid by [Pearl], the person sought to be charged."[196]  In determining whether this element is satisfied, "the key consideration is the timing of when the plaintiff informs the defendant that it expects to be paid directly by the defendant."[197]

Maverick alleges that the December 6, 2016 email from Dr. Dria was sufficient to satisfy this element.[198]  However, this was an email sent *by* Dr. Dria not to her.[199]  Thus, it does not conclusively demonstrate Maverick's intent to be paid by Pearl.  If anything, this email chain shows that Maverick did not report directly to Pearl but instead was communicating through PDS.[200]  Maverick's further

---

[194] ECF Nos. 102-18 and 102-21 at 1-3.
[195] *All Tex. Elec. Contractors, Inc. v. NSPS Metals LLC (In re All Tex. Elec. Contractors, Inc.)*, Nos. 20-34656, 21-3287, 2022 Bankr. LEXIS 113, at *33 (Bankr. S.D. Tex. 2022).
[196] *Vortt Exploration Co. v. Chevron U.S.A., Inc.*, 787 S.W.2d 942, 944 (Tex.1990).
[197] *Sys. One Holdings LLC v. Campbell*, Civil Action No. B: 18-cv-54, 2018 U.S. Dist. LEXIS 153965, at *15 (S.D. Tex. 2018).
[198] ECF No. 133 at 16.
[199] ECF No. 94-5.
[200] *Id.*

actions such as invoicing PDS rather than Pearl in December and January 2016[201] and sending a W-9 only to PDS[202] also support the finding that Maverick sought to be paid by PDS rather than Pearl. Since Maverick has failed to show that it sought to be paid by Pearl, Maverick has not met its burden in pleading an essential element of quantum meruit.

Accordingly, Maverick's claim for quantum meruit is denied.

## F.  Maverick's Counterclaim for promissory estoppel

Although promissory estoppel is defensive in nature, it is an available cause of action to a promisee who relied to his detriment on an otherwise unenforceable promise.[203]  The function of the doctrine of promissory estoppel is to estop a promisor from denying the enforceability of the promise.[204]  In other words, it "prevents a party from insisting upon his strict legal rights"—i.e. the right to avoid the promise as not contractually binding—"when it would be unjust to allow him to enforce them."[205]  "The vital principle of estoppel is that he who by his language or conduct leads another to do what he would not otherwise have done, shall not subject such person to loss or injury by destroying the expectations upon which he acted."[206]  The elements of promissory estoppel are: (1) a promise, (2) foreseeability of reliance thereon by the promissor, and (3) substantial reliance by the promisee to his detriment.[207]  However, if a valid contract exists covering the alleged promise, a plaintiff cannot recover under promissory estoppel.[208]

Maverick contends that it entered into the Pearl MSA and that under Section 9.4 of the Pearl MSA, Pearl promised to compensate Maverick for costs incurred by Maverick in getting the Wild

---

[201] ECF No. 102-21 at 17.
[202] ECF Nos. 102-18 and 102-21 at 1-3.
[203] *Frost Crushed Stone Co. v. Odell Geer Constr. Co.*, 110 S.W.3d 41, 44 (Tex. App.—Waco 2002, no pet.).
[204] *Wheeler v. White*, 398 S.W.2d 93, 96 (Tex. 1965) (citing Restatement (First) of Contracts § 90 (1932)).
[205] *Wheeler*, 398 S.W. 2d at 96.
[206] *Montgomery Indus. Int'l, Inc. v. Thomas Const. Co.*, 620 F.2d 91, 96 (5th Cir. 1980).
[207] *English v. Fischer*, 660 S.W.2d 521, 524 (Tex. 1983).
[208] *Lombana v. AIG Am.*, No. 01-12-00168-CV, 2014 Tex. App. LEXIS 2302, at *22-23 (Tex. App.—Houston [1st Dist.] Feb. 27, 2014, pet. denied).

Well under control.[209]  Maverick further alleges that it was foreseeable that Pearl would keep this promise because Pearl was aware Maverick was at the Well performing and Dr. Dria approved the work.[210]  Finally, Maverick alleges that it substantially relied on Pearl's promise to pay by performing at the Well.[211]

Maverick's promissory estoppel argument is flawed for several reasons.  In Maverick's argument, the alleged promise by Pearl was made pursuant to Section 9.4 of the Pearl MSA.[212]  Under Texas Law, "[a] master service agreement does not provide for the performance of any specific work or any specific price; instead it requires the issuance of work orders and, upon acceptance of the work orders, they become part of the master service agreement."[213]  Furthermore, a plaintiff cannot recover under promissory estoppel if a valid contract exists covering the alleged promise.[214]

To the extent Maverick asserts that the Pearl MSA was a valid contract because Pearl subsequently approved work orders, Section 9.4 would become part of a valid contract and thus Maverick could not recover under a promissory estoppel theory.  On the other hand, if Maverick contends that that the Pearl MSA never became a valid contract because of the failure to subsequently ratify work orders, Maverick failed to prove that Pearl actually promised to compensate Maverick for costs incurred by Maverick in getting the Wild Well under control.  Section 9.4 of the Pearl MSA provides that "Company shall be liable for the costs of regaining control of any wild well, as well as for cost of removal of any debris, and shall release Contractor from, and Contractor shall indemnify against any liability for such cost."[215]  Nothing in this language or elsewhere in the Pearl MSA reflects an

---

[209] ECF No. 133 at 17.
[210] *Id.* at 17-18.
[211] *Id.*
[212] *Id.* at 17.
[213] *Shell W. E&P, Inc.*, 509 S.W.3d at 587.
[214] *Lombana v. AIG Am.*, No. 01-12-00168-CV, 2014 Tex. App. LEXIS 2302, at *22-23 (Tex. App.—Houston [1st Dist.] Feb. 27, 2014, pet. denied).
[215] ECF No. 94-5 at 3.

intent for Pearl to be immediately bound.  Since a master service agreement typically reflects prom-

ises made by the parties to perform only in the event future work orders were subsequently ap-

proved,[216] Pearl is not promising generally to compensate Maverick for costs incurred by Maverick

in getting the Wild Well under control but to do so only in the event that Pearl subsequently approved

work orders.  Thus, in either scenario Maverick's promissory estoppel claim fails.

    Accordingly, Maverick's claim for promissory estoppel is denied.

### G.  Pearl's request for attorney's fees pursuant to Tex. Prop. Code §§ 56.041 and 53.156

    In the United States, courts follow the American Rule, which holds that the prevailing litigant

is not entitled to collect reasonable attorney's fees from the loser unless an exception applies.[217]  One

such exception is Tex. Prop. Code §§ 56.041 and 53.156 under which courts from within the Fifth

Circuit have frequently granted requests for reasonable attorney's fees.[218]  Here, Pearl has requested

reasonable and necessary attorney's fees pursuant to Tex. Prop. Code §§ 56.041 and 53.156.  Tex.

Prop. Code § 56.041, provides that a mineral lien claimant "must enforce [its] lien within the same

time and in the same manner as a mechanic's, contractor's, or materialman's lien under Chapter 53

[of the Texas Property Code]."[219]  In turn, Chapter 53, which governs traditional mechanics'/mate-

rialmen's liens, provides that "the court may award costs and reasonable attorney's fees as are equi-

table and just" in proceedings to foreclose a lien or "in any proceeding to declare that any lien or

claim is invalid or unenforceable in whole or in part."[220]  As the prevailing party in this adversary

proceeding to determine the validity of Pearl's mineral property liens, the court deems it equitable

---

[216] *Tow v. Gemini Ins. Corp. (In re ATP Oil & Gas Corp.)*, Nos. 12-36187, 14-3316, 2015 Bankr. LEXIS 3463, at
*13 (Bankr. S.D. Tex. 2015) ("A master service agreement is an agreement to abide by certain terms if the parties
agree to do something in the future.").

[217] *In re Dernick*, Nos. 18-32417, 18-32494, 2020 Bankr. LEXIS 1345, at *11 (Bankr. S.D. Tex. 2020).

[218] *D2 Excavating, Inc. v. Thompson Thrift Constr., Inc.*, No. 2:16-CV-538, 2021 U.S. Dist. LEXIS 138465, at *28
(S.D. Tex. 2021); *Baker Hughes Oilfield Operations, Inc. v. Union Bank of Cal., NA (In re Cornerstone E&P Co.,
LP)*, 435 B.R. 390, 415 (Bankr. N.D. Tex. 2010).

[219] TEX. PROP. CODE § 56.041.

[220] TEX. PROP. CODE § 53.156.

and just to award costs and reasonable attorney's fees to Pearl.

Accordingly, Pearl's request for reasonable attorney's fees pursuant to Tex. Prop. Code §§ 56.041 and 53.156 is granted.  Pearl is ordered to file an application for attorney's fees by no later than October 26, 2022.  Maverick will have until November 28, 2022 to file an objection, if any, to Pearl's request for attorney's fees.

### V.  CONCLUSION

A judgment consistent with the Memorandum Opinion will be entered on the docket simultaneously herewith.

SIGNED September 26, 2022

Eduardo Rodriguez
United States Bankruptcy Judge